Case 1:22-cv-09911-ALC  Document 22  Filed 03/29/24  Page 1 of 11

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: _3/29/2024_

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, and Bernard L. Madoff,** | |
| Plaintiff-Appellee, | Adv. Pro. No. 11-02493 |
| -against- | 22-cv-09911 (ALC) |
| **ABU DHABI INVESTMENT AUTHORITY,** | **OPINION & ORDER** |
| Defendant-Appellant. | |

**ANDREW L. CARTER, United States District Judge:**

The Court considers herein Abu Dhabi Investment Authority's ("Defendant" or "ADIA") appeal of the Bankruptcy Court's denial of their motion to dismiss Irving H. Picard's ("Trustee") complaint. For the reasons stated herein, the Court **AFFIRMS** in part and **REVERSES** in part the Bankruptcy Court's opinion and **REMANDS** the case for further proceedings consistent with this Opinion and Order.

## BACKGROUND

I.   Procedural Background

The Trustee brought the initial bankruptcy action against the Defendant as part of its responsibility to oversee the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"). Like many other cases brought within and without this District, the Trustee brings this action to recover former BLMIS investors' funds from the Defendant. *See Picard v. Gettinger (In re BLMIS)*, 976 F.3d 184, 188 (2d Cir. 2020) (noting that the general factual background of the BLMIS Ponzi scheme and associated proceedings "are well documented across many pages of the Federal Reporters"). The operative procedural and factual background

of this case largely mirror those present in *Pub. Inst. for Soc. Sec. v. Picard (In re Bernard L. Madoff Inv. Sec. LLC)*, No. 1:22-cv-8741-GHW, 2023 U.S. Dist. LEXIS 167463 (S.D.N.Y. Sep. 20, 2023) (hereafter *PIFSS*).

The Trustee filed the initial complaint in this case against the Defendant on August 11, 2011.  JA1-14.[1]  Therein, the Trustee alleged that Defendant received two transfers totaling $300 million from BLMIS "feeder fund" Fairfield Sentry Limited.  JA 2-4 at ¶ 2, 7; *see also* JA 101 (indicating in an exhibit to the complaint that the operative transfers were made on April 4, 2005 and March 30, 2006 and totaled $200 and $100 million respectively).  The complaint alleged that Defendant "knowingly direct[ed] funds to be invested with New York-based BLMIS through Fairfield Sentry."  JA 4 at ¶ 7; *see also id.* (alleging that "Defendant . . . entered into a subscription agreement with Fairfield Sentry under which ADIA submitted to New York jurisdiction"); JA 2 at ¶ 2 (noting that Fairfield Sentry "maintained in excess of 95% of its assets in its BLMIS customer accounts"); JA1006-1014 (reproducing subscription forms between Defendant and Fairfield Sentry).

Defendant moved to dismiss the Trustee's complaint on May 11, 2022.  *See generally* JA 893-941.  *Inter alia*, Defendant argued that they were immune from suit under the Foreign Sovereign Immunities Act ("FSIA").  JA 908-914.  In denying Defendant's sovereign immunity argument, the Bankruptcy Court determined that the statutory "commercial activities" exception applied because the complaint was based upon Defendant's actions which caused a direct effect in the United States.  *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Nos. 08-01789 (CGM), 11-02493 (CGM), 2022 Bankr. LEXIS 3063, at *5-*10 (Bankr. S.D.N.Y. Oct. 28, 2022) (hereafter "SIPC"); *see also* 28 U.S.C. § 1605(a)(2).  ADIA filed a timely notice of appeal on

---

[1] The notation "JA" refers to the Parties' joint appendix docketed at ECF No. 11.

November 16, 2022 stating their desire to appeal the Bankruptcy Court's denial of their sovereign immunity defense. JA1608-1611.

II.     Factual Background

The Court assumes the Parties' familiarity with the facts in this case and directs readers to the Bankruptcy Court's dismissal opinion for a more fulsome recitation of the general facts. SIPC at *2-*4; *see also Picard v. Citibank, N.A. (In re BLMIS)*, 12 F.4th 171, 178-83 (2d Cir. 2021), *cert. denied sub nom. Citibank, N.A. v. Picard*, 142 S. Ct. 1209, 212 L. Ed. 2d 217 (2022) (recounting the factual background of the BLMIS Ponzi scheme and SIPA proceeding). Only those facts germane to the review of the Bankruptcy Court's decision are restated here.

As was true in *PIFSS*, ADIA "did not invest directly in BLMIS" but rather "invested in equity securities of Fairfield Sentry" and "BLMIS made investments on behalf of Fairfield Sentry." *PIFSS* at *5-*6. ADIA made 15 subscription payments to Fairfield Sentry between 1996 and 2000 totaling well over $100 million. JA1000-1001. As in *PIFSS*, ADIA transferred subscription funds to Fairfield Sentry by wiring money to Fairfield's Netherlands bank account vis-à-vis an intermediary New York bank. JA 1033; *see also PIFSS* at *6. Unlike in *PIFSS*, one subscription form requesting a $25,000,000 stock purchase dated May 30, 2000 executed by ADIA and another short subscription form requesting a $50,000,000 stock purchase dated September 30, 2002 executed by ADIA and indicating that the Defendant had previously delivered a fully executed subscription agreement were presented to the Bankruptcy Court as exhibits to the Plaintiff Trustee's opposition to the motion to dismiss. JA 1006-1014.

Here also, Fairfield Sentry's Information Memorandum dated January 1, 1998 governed ADIA's rights as a shareholder. JA 1021-1055. The Memorandum:

> disclosed BLMIS's multiple roles as the de facto investment manager, broker-dealer, and custodian for Sentry and highlighted the numerous U.S. connections

inherent in investing in Sentry, including: (i) Sentry invested at least 95% of its assets with BLMIS in New York; (ii) New York-based BLMIS was the custodian of Fairfield Sentry's investments with BLMIS in New York; (iii) any returns on investment in the Sentry would purportedly be earned by BLMIS in New York through its execution of the SSC Strategy; (iv) BLMIS's SSC Strategy purportedly involved the purchase and sale of U.S. securities, U.S. options, and U.S. Treasury Bills; and (v) BLMIS performed all investment management duties for Sentry, and the decisions regarding when and which U.S. securities to purportedly purchase were made by BLMIS in New York.

ECF No 14 ("Opp.") at 6. The Information Memorandum also set out investors' redemption rights and included model redemption request forms. JA 1041-1042; JA 1052-1054; *see also PIFSS* at *8 (describing shareholders' redemption rights). The Parties have presented one redemption form dated March 3, 2005 in which ADIA requested the redemption of "[their] investment, in its entirety" and directing transfer of the proceeds to their eponymous JPMorgan Chase Bank Account in Tampa, Florida. JA 1585-1589. While this redemption form does not state the cash value of the investment redeemed and the Parties have not presented a redemption form corresponding to the alleged April 2006 redemption request, it is undisputed that ADIA exercised their redemption rights between March 2005 and March 2006 to the tune of $300 million. ECF No. 11 ("Mot.") at 5; *see also* JA 891 ¶ 6 (ADIA stating the same in their motion to dismiss before the Bankruptcy Court). Nevertheless, Plaintiff alleges that ADIA received $200 million from their March 2005 redemption on April 4, 2005 and a further $100 million from their March 2006 redemption on March 30, 2006. JA 101.

In a letter to the Court, the Trustee has indicated that on April 1, 2005, shortly following the March 3, 2005 redemption request but prior to ADIA's receipt of funds, Fairfield Sentry received a transfer from BLMIS totaling $175 million. ECF No. 19 at 1. That same letter also alleges that Fairfield Sentry received two $50 million transfers from BLMIS between ADIA's "March 2006" redemption request and March 30, 2006 $100 million cash out. *Id.*

**LEGAL STANDARD**

    I.      Appellate Standard

The collateral-order doctrine grants this Court jurisdiction over the present appeal. *See Petersen Energía Inversora S.A.U. v. Argentine Republic and YPF S.A.*, 895 F.3d 194, 203 (2d Cir. 2018). This Court reviews the Bankruptcy Court's conclusions of law "concerning sovereign immunity de novo and its factual findings for clear error." *Kensington Int'l Ltd. v. Itoua*, 505 F.3d 147, 153 (2d Cir. 2007).

"Dismissal of a case for lack of subject matter jurisdiction under Rule 12(b)(1) is proper when the district court lacks the statutory or constitutional power to adjudicate it." *Gelmart Indus. v. Eveready Battery Co.*, 120 F. Supp. 3d 327, 329-30 (S.D.N.Y. 2014) (quoting *Ford v. D.C. 37 Union Local 1549*, 579 F.3d 187, 188 (2d Cir. 2009)) (quotation marks omitted). "[T]he Court generally must accept the material factual allegations in the complaint as true," but "does not draw all reasonable inferences in the plaintiff's favor" when considering a 12(b)(1) motion on sovereign immunity grounds. *Pablo Star Ltd. v. Welsh Gov't*, 378 F. Supp. 3d 300, 306 (S.D.N.Y. 2019). While a reviewing court "may refer to evidence outside the pleadings," *Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 441 (2d Cir. 2022), "[i]t is only where jurisdictional facts are placed in dispute that the court has the obligation to decide issues of fact by reference to evidence outside the pleadings, such as by affidavits." *Id.* (citing *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014)) (internal quotation marks omitted). "When the extrinsic evidence submitted by the parties does not controvert the material allegations of the complaint, it is not error for the district court to base its ruling solely on the allegations of the complaint." *Id.*

II.     Foreign Sovereign Immunities Act

A defendant seeking to assert sovereign immunity under FSIA must "present a *prima facie* case that it is a foreign state." *Kensington*, 505 F.3d at 153. From there, "the plaintiff has the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted." *Cabiri v. Gov't of the Republic of Ghana*, 165 F.3d 193, 196 (2d Cir. 1999). If the plaintiff succeeds at this step, the burden then returns to the defendant to "prov[e], by a preponderance of the evidence, that the alleged exception does not apply." *Pablo Star Ltd.*, 961 F.3d at 560.

"Because the [P]arties agree that ADIA is a foreign sovereign," the only dispute in this action is whether a statutory exception applies to ADIA's claim of sovereign immunity. Opp. at 14. The Bankruptcy Court relied on the third clause of the commercial activities exception to deny Defendant's motion to dismiss. *SIPC* at *5-*6. The full text of that exception is as follows:

> [a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which the action is [i] based . . . upon an act outside the territory of the United States [ii] in connection with a commercial activity of the foreign state elsewhere and [iii] that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2). As was the case in *PIFSS*, ADIA's "argument focuses on the first and third prongs to th[e] exception." *PIFSS* at *14.[2] To assess whether the first "based upon" element is made out, "a court [must] identify the particular conduct on which the plaintiff's action is based." *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 33, (2015) (*Saudi Arabia v. Nelson*, 507 U.S. 349, 356, 113 S. Ct. 1471, 123 L. Ed. 2d 47 (1993)) (cleaned up). "[A] court should identify that 'particular conduct' by looking to the 'basis' or 'foundation' for a claim . . .

---

[2] Because the Parties' submissions also treat the "two burden-shifting steps as essentially one issue—whether or not an exception to the FSIA applies here," the Court does the same by focusing "on the broader question of whether or not an exception [to] the FSIA applies to this case." *PIFSS* at *13 n.2 (citing *Pablo Star*, 961 F.3d at 560-566).

'those elements . . . that, if proven, would entitle a plaintiff to relief,' . . . and the gravamen of the complaint." *Id.* at 33-34 (quoting *Nelson*, 507 U.S. at 357) (internal quotations omitted).

As to the third "direct effect" prong, "an effect is direct if it follows as an immediate consequence of the defendant's . . . activity." *Guirlando v. T.C. Ziraat Bankasi A.S.*, 602 F.3d 69, 74 (2d Cir. 2010) (quoting *Republic of Argentina v. Weltover*, 504 U.S. 607, 618, (1992)). An effect "need not be substantial or foreseeable" to be direct, *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 108 (2d Cir. 2016) (internal citation omitted), though it must be legally significant. *Guirlando* 602 F.3d at 77 ("That the money came from a bank account in New York is a fact but one without legal significance to the alleged tort.").

## DISCUSSION

As was the case in *PIFSS*, "[t]he Bankruptcy Court's decision rested on [the] faulty assumption that the Defendant and the Trustee agree that the gravamen of the Complaint . . . is [ADIA's] receipt of funds due to its subscription into Fairfield Sentry." *PIFSS* at *15; *see also SIPC* at *6-*7. Therefore, it was inappropriate for the Bankruptcy Court to "defin[e] the relevant act to include [ADIA's] initial subscription into Fairfield Sentry" without "consider[ing] the issue independently." *PIFSS* at *15, *17.

I. Relevant Act

ADIA argued below and argues before this Court that the Trustee has not alleged any acts undertaken by the Defendant beyond their passive "receipt of funds" for the application of the commercial activity exception. Mot. at 9. The Trustee argues here, and the Bankruptcy Court held below that the Parties agreed, that the gravamen of the suit was "ADIA's receipt of funds from Fairfield Sentry due to its subscription into Fairfield Sentry and its redemption requests." Opp. at 21.

ADIA, relying on the Supreme Court's decision in *OBB Personenverkehr AG v. Sachs*, argues that its subscription into Fairfield Sentry and redemption requests can not form the gravamen of the Complaint "because proof of that subscription is neither sufficient nor necessary to entitle the Trustee to relief." Mot. at 9 (citing *Sachs*, 577 U.S. at 34). Referencing the elements of the Trustee's subsequent transfer claim under 11 U.S.C. § 550(a)(2), which allows a "trustee [to] recover, for the benefit of the estate [a transfer] from . . . any immediate or mediate transferee of such initial transferee," ADIA argues that because their potential liability would be based exclusively upon their receipt of property, their redemption requests and subscription into Fairfield Sentry cannot form the gravamen of the complaint. *Id.*

This Court finds that, at least as to ADIA's argument regarding their redemption requests, this reading of *Sachs* is "unduly constrained." *PIFSS* at *17 n.4. *Sachs*, while indeed referencing "those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case," also counseled against "exhaustive claim-by-claim, element-by-element analysis." *Sachs*, 577 U.S. at 34 (quoting *Nelson*, 507 U.S. at 357). "Rather than individually analyzing each of the . . . causes of action, [the Supreme Court] zeroed in on the core of the[] suit." *Id.* at 35 (quoting *Nelson*, 507 U.S. at 358); *see also Atlantica Holdings*, 813 F.3d at 108 (stating that reviewing courts are to "look not to the analysis of each individual claim, but to the overall question where a lawsuit's foundation is geographically based" when determining the gravamen of a suit).

Therefore, this Court finds that ADIA's redemption requests and receipt of funds were acts upon which the gravamen of this suit is based. ADIA's subscription into Fairfield Sentry is not a qualifying "act" on these facts within the meaning of FSIA. While crediting ADIA's view that only their receipt of funds form the gravamen of this suit would improperly "place[]"

excessive emphasis on the elements of the Trustee's claims," to include ADIA's subscription into the fund which occurred decades prior to the redemptions forming the core of this case would be improper under *Sachs*. *PIFSS* at *17 n.4. The redemption requests are also inextricably linked to ADIA's receipt of funds from Fairfield Sentry as they are close in time to the fund transfers and form the beginning of the causal chain by which ADIA reclaimed the relevant funds.

II.     Direct Effect

It is clear from the undisputed evidentiary record that ADIA's March 3, 2005 redemption request and associated receipt of funds had a direct effect in the United States. This is because "[t]he direct effect requirement is satisfied where the parties to a transaction, including the sovereign defendant, specifically agree or specifically contemplate that payment will be made to a United States bank account, and the plaintiff's cause of action arises out of that transaction." *Skanga Energy & Marine, Ltd. v. Arevenca S.A.*, 875 F. Supp. 2d 264, 271 (S.D.N.Y. 2012) (citing Rogers v. Petroleo Brasileiro, S.A., 673 F.3d 131, 139 (2d Cir. 2012). There is no dispute between the Parties that ADIA directed Fairfield Sentry to wire the redeemed funds into their bank account located in Tampa, Florida within the associated redemption request, that such payment was made to that very same account, and that this cause of action arises out of this transaction. The joint appendix also contains evidentiary documents that independently confirm these events. The Bankruptcy Court therefore committed harmless error as to this transfer and the denial of dismissal is affirmed in part.[3]

The evidentiary record as to ADIA's March 2006 redemption request and alleged March 30, 2006 $100 million payment is much less clear. Despite the fact that the Parties agree that

---

[3] Because there are independent grounds which establish the application of the commercial activity exception, the Court need not consider whether ADIA's redemption request caused Fairfield Sentry to request and/or receive funds from BLMIS.

ADIA received $300 million from Fairfield Sentry between March 2005 and March 2006, neither party has produced ADIA's executed redemption request form or indicated the precise date upon which ADIA allegedly made the redemption request. As such, there is no evidence supporting a finding that ADIA received the $100 million funds into a bank account in the United States as was true in the previous redemption. The only evidence in the record potentially supporting a finding that this alleged redemption and receipt of funds had a direct effect in the United States is the fact that Fairfield Sentry received two $50 million transfers from BLMIS on March 27, 2006, three days prior to ADIA's alleged receipt of the funds. ECF No. 19 at 1. While it is possible that ADIA's redemption request could have "triggered . . . movement of funds from BLMIS to Fairfield Sentry" given the timeline of events, there is insufficient evidence within the record at this time to support such a finding. *PIFSS* at *19. As in *PIFSS,* ADIA's redemption request could have occurred later in time to the transfers from BLMIS such that those transfers were not "an immediate consequence of the defendant's . . . activity." *Guirlando* 602 F.3d at 74 (internal citations and quotations omitted). While this Court finds that the Trustee has not met their burden to establish that an exception to ADIA's sovereign immunity applies and reverses the Bankruptcy Court's decision in part on those grounds, it also recognizes the possibility that further discovery may uncover facts from which to conclude that the commercial activity exception applies.

## CONCLUSION

For the reasons stated above, the Bankruptcy Court's denial of Defendant's motion to dismiss is **AFFIRMED** in part and **REVERSED** in part and remanded to the Bankruptcy Court for further proceedings in accordance with this Opinion and Order.

**SO ORDERED.**

Dated:   **March 29, 2024**
         **New York, New York**

                                          **ANDREW L. CARTER, JR.**
                                          **United States District Judge**